# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **STACY WILKERSON,** | : |
| Plaintiff, | : CIV. ACTION NO. 2:23-cv-1714 |
| v. | : |
|  | : **COMPLAINT** |
| **RUSH STREET GAMING,** | : |
| Defendant. | : **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Stacy Wilkerson, by and through undersigned counsel, The Lacy Employment Law Firm LLC, hereby files this Complaint against Defendant and states as follows:

### PROCEDURAL AND ADMINISTRATIVE REMEDIES

1. All the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference as if set forth herein at length.

2. Venue is proper in the District Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

3. On or about March 28, 2022, Plaintiff dual-filed a charge with the Pittsburgh office of the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania

Human Relations Commission alleging failure to accommodate.[1] *See* EEOC Charge of Discrimination, attached as Exhibit 1.

4. Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## PARTIES

5. Plaintiff Stacy Wilkerson is a disabled 35-year old woman who was previously employed at Rivers Casino owned by Rush Street Gaming. Ms. Wilkerson resides at 82 Midway Court Newell, WV 26050.

6. Defendant Rush Street Gaming ("Defendant"), at all relevant times, employed Plaintiff at the 777 Casino Drive, Pittsburgh, PA 15212, location.

## FACTUAL BACKGROUND

7. Ms. Wilkerson was hired by Clark Tomer on May 7, 2012, as a Bartender at Rivers Casino ("Rivers") located in Pittsburgh which is owned by Defendant.

8. Ms. Wilkerson's job duties included making and serving drinks, stocking, maintaining a clean bar area, and following cash handling procedures while addressing customer needs and expectations.

9. Plaintiff consistently received good, if not excellent, performance reviews and praise from customers and hospitality industry professionals alike.

10. Since its inception, Ms. Wilkerson frequently made Top Performer and was a regular recipient of the Rivers Edge Recognition Award.

---

[1] Plaintiff's claims under the PHRA and PFPO are referenced for notice purposes. Plaintiff is required to wait one full year from the time of filing the dual-filed charge to bring claims under the PHRA and PFPO. Plaintiff must however file her lawsuit in advance of the same because of the date of issuance of her federal right-to-sue letter.

11. Ms. Wilkerson's unfaltering work quality and dedication to Rivers Casino is reflected by her many Rivers Edge Awards, the last awarded on September 23, 2021.

12. Ms. Wilkerson started using her paid time off to address her mental health disabilities in late March 2021.

13. Beverage President Matt Harvey was very supportive of Ms. Wilkerson's mental health healing journey, as was Beverage Manager, Erik Martins.

14. Mr. Harvey retired in January, 2020, and Mr. Martins left Rivers Casino on April 8, 2021.

15. Despite her exceptional performance, Ms. Wilkerson was bullied by other Rivers Casino employees, after Wheelhouse Supervisor Chris learned that her absences were approved due to her disability.

16. Chris, who was hired by Rivers in 2019, was known to have violated Rivers' policy due to his fraternizing with other employees in 2021.

17. Chris exploited his social relationships with his colleagues by intentionally creating a hostile work environment for Ms. Wilkerson by way of verbal harassment due to Plaintiff's approved absences for her disability.

18. Other Rivers Casino employees, e.g., Jordan and Trevor, began posting derisive messages on social media aimed at Ms. Wilkerson and those who took "FMLA".

19. On June 17, 2021, Ms. Wilkerson complained to Beverage Supervisor Matt Arling about Chris' discriminatory treatment of her. Ms.

20. Wilkerson also sent Wheelhouse Manager Clark Tomer a text message concerning the discrimination since she primarily worked in the Wheelhouse.

21. Mr. Arling informed Ms. Wilkerson that he would notify Beverage Manager Jackie Monaco and the following week, Ms. Monaco implied that she thought Ms. Wilkerson was lying about Chris.

22. After escalation of the derisive social media posts, and hostile work environment initiated by Chris, Ms. Wilkerson complained to Andrea Marion Kleinrock, Vice President of Food and Beverage at Rivers Casino, on September 15, 2021, about Chris' and other coworkers' treatment, which included posts on Facebook about Ms. Wilkerson calling off work and using FMLA leave.

23. From Ms. Kleinrock's inept response, it became apparent to Ms. Wilkerson that her complaint was not being taken seriously.

24. Ms. Kleinrock also commented that "too many people were calling off" during Covid.

25. At 9:40 AM, on October 1, 2021, Ms. Wilkerson received a phone call from MetLife informing her that Rivers had not approved her September absences because they were not reported to MetLife within twenty-four hours.

26. This was the first that Ms. Wilkerson was made aware of such a policy – she was surprised because absences in July and August were approved, despite not adhering to the policy that she was unaware of at the time.

27. The MetLife representative informed Ms. Wilkerson that she would email Rivers, requesting that it make a one-time exception and approve the September absences.

28. Moving forward, Ms. Wilkerson would then report the absences within the mandated twenty-four hours.

29. Ms. Wilkerson then left a message for Ryan Phylis in River's Human Resources to address the misunderstanding.

30. At 2:43 PM, the same day, Mr. Phylis called Ms. Wilkerson and switched to speakerphone with Janet Crans, also of Rivers' Human Resources.

31. Together, they informed Ms. Wilkerson that she was being terminated for violating Rivers' policy of not reporting the September absences to MetLife within twenty-four hours, thereby exceeding the eight (8) credit limit by half (0.5) a credit.

32. However, MetLife letters show that Rivers approved Ms. Wilkerson's ADA days off in July and August when she had not notified MetLife within twenty-four hours of an absence.

33. Furthermore, records show that Ms. Wilkerson had a sick day remaining at the time she was verbally informed of her termination.

34. Therefore, her actual credit should have been 7.5, below the Rivers' threshold for termination, even if they would not approve the September absences.

35. It was clear to Ms. Wilkerson that the only difference between previous absences and the unexcused in September – Rivers' pretext for termination – was that the excused absences occurred before she complained about discrimination to Ms. Kleinrock.

36. Rivers terminated Plaintiff because her disability required reasonable accommodation.

37. She was replaced by an employee that was not disabled.

### COUNT I
**Violation of the Americans with Disabilities Act ("ADA"),**
*Disability Discrimination, Retaliation, Harassment and Failure to Accommodate a Disability*

38. Plaintiff suffered from qualifying health conditions under the ADA that affected her ability at certain times to perform daily life activities.

39. Defendant was at all times an employer with more than 15 employees and subject to the ADA.

40. Plaintiff's disability is recognized as disability under the ADA.

41. Plaintiff was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation.

42. Plaintiff informed Defendant's managers/supervisors of her mental health disorders. She also informed them of the need for medical treatment and/or accommodations.

43. Despite Plaintiff's health conditions and limitations, she was still able to perform the duties of her job with or without reasonable accommodations.

44. Plaintiff requested a reasonable accommodation in the form of flexible scheduling and hours throughout the week. Defendant terminated Plaintiff because of, and in retaliation for, requesting a reasonable accommodation under the ADA.

45. Defendant failed to participate in the interactive process required by the ADA for determining whether a reasonable accommodation is possible.

46. Defendant's actions in subjecting Plaintiff to discrimination based on her actual and/or perceived disabilities and/or record of impairment, and retaliating against her for requesting a reasonable accommodation for Plaintiff's disabilities.

47. As a result of unlawful, discriminatory, and retaliatory employment practices in violation of the ADA of which Defendant engaged, Plaintiff sustained permanent and irreparable harm, resulting in termination from employment, which caused loss of earnings, plus the value of certain benefits, loss of future earning power, back pay, front pay and interests.

## COUNT II
### FMLA Violations
*Interference and Retaliation*

48. Plaintiff incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

49. The FMLA prohibits discrimination or retaliation against an employee for exercising her FMLA rights or for opposing any practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(1).

50. The FMLA prohibits employers from interfering with employees obtaining FMLA leave.

51. The actions of Defendant, in retaliating against Plaintiff for exercising her right to utilize FMLA, and interfering with his right to take FMLA leave, as described herein, constitutes a violation of the FMLA.

52. Defendant's actions were willful, malicious, wanton, in bad faith and in reckless disregard of Plaintiff's rights.

53. As a direct result of the willful, wanton, reckless, careless, and negligent acts of the Defendant, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until the Court grants the relief requested.

## COUNT III
### Violations of PHRA
*Disability Discrimination, Retaliation, Harassment, FMLA Retaliation and Interference, and Failure to Accommodate a Disability*

54. Plaintiff hereby incorporates all allegations contained in the above-mentioned paragraphs fully as if they were set forth at length. Specifically, Plaintiff incorporates the

allegations with respect to Plaintiff's ADA, which are the factual predicate for Plaintiff's PHRA claims. The basis for the discrimination, harassment, and retaliation of which Plaintiffs suffered is detailed more fully above.

55. Defendant's discriminatory and retaliatory actions, as set forth herein, deprived Plaintiff of her rights guaranteed under the PHRA.

56. Defendant is a covered employer under PHRA.

57. As a result of Defendant's actions, Defendant has denied Plaintiff's the right to the same terms, conditions, privileges and benefits of her employment with Defendant.

58. Plaintiff is a member of protected classes and was qualified for the positions that she held.

59. Defendant's actions altered Plaintiff's work environment.

60. The discrimination that Plaintiff faced detrimentally affected Plaintiff. Further, this discrimination would detrimentally affect a reasonable person in similar circumstances.

61. This severe and pervasive environment continued throughout Plaintiff's employment.

62. Defendant is liable for their supervisors under respondeat superior.

63. Plaintiff participated in protected conduct. Defendant retaliated against Plaintiff because of their participation in protected activities. There is a causal connection between Plaintiff's participation in protected activities and the adverse employment action from which Plaintiff's suffered.

64. As a direct and proximate result of Defendant's acts and conduct, Plaintiff has suffered and will suffer those injuries, damages, and losses alleged herein and have incurred and will incur attorneys' fees.

65. The wrongful acts and conduct of Defendant was done with deliberate indifference to the statutory and constitutional rights of Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks damages and legal and and equitable relief in connection with Defendant's improper conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a) Declaring the acts and practices complained of herein to be in violation of the ADA, FMLA and the PHRA;

b) Enjoining and permanently retraining the violations alleged herein;

c) Entering judgment against the Defendant and in favor of the Plaintiff in an amount to be determined;

d) Awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendant's improper conduct;

e) Awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasure, which Plaintiff has suffered or may suffer as a result of Defendant's improper conduct;

f) Awarding punitive damages to Plaintiff;

g) Awarding Plaintiff such other damages as are appropriate under ADA, FMLA and the PHRA;

h) A jury trial trial is demanded on all triable issues in this case;

i) Awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorney's fees; and,

j) Granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

Respectfully submitted,

Dated: September 29, 2023

*/s Andrew Lacy, Jr. Esq.*
**THE LACY EMPLOYMENT LAW FIRM LLC**
3675 Market Street
Philadelphia, PA 19104
(t) 412-301-3908
andrew.lacy@employment-labor-law.com

*Counsel for Plaintiff*